FILED
2021 Mar-10  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHWESTERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **JULIA HELTON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  3:19-cv-02115-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **the Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Julia Helton has asked the Court to review a final adverse decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).  For the reasons below, the Court will affirm the Commissioner's decision.

### Procedural Background

Ms. Helton applied for a period of disability and disability insurance benefits on August 23, 2016, alleging that her disability began on December 14, 2015.  (Doc. 6-6, p. 2).  The Commissioner initially denied Ms. Helton's claim, and she requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 6-4, p. 2; Doc. 6-5, p. 10).  After her hearing, the ALJ issued an unfavorable decision.  (Doc. 6-3, pp. 16–25).  The Appeals Council denied Ms. Helton's request for review, making the

1

Commissioner's decision final for this Court's judicial review.  (Doc. 6-3, p. 2); *See* 42 U.S.C. § 405(g).

## Standard of Review

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [her] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510–11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In making this evaluation, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for the ALJ's.  *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).   If the ALJ's decision is supported by substantial evidence, a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145–46 (11th Cir. 1991).

### Statutory and Regulatory Framework

To be eligible for disability benefits, a claimant must be disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin*, 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)). A claimant must prove that she is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ must consider:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC")

assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.  "The claimant has the burden of proof with respect to the first four steps."  *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009).  "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy."  *Wright*, 327 Fed. Appx. at 137.

## The Administrative Law Judge's Findings

The ALJ found that Ms. Helton had not engaged in substantial gainful activity between December 14, 2015, the alleged onset date, and June 30, 2016, the date Ms. Helton was last insured.  (Doc. 6-3, p. 21).  The ALJ determined that Ms. Helton suffered from the severe impairment of mild degenerative disk disease of the cervical and lumbar spine.  (Doc. 6-3, p. 21).  She also determined that Ms. Helton had the non-severe medically determinable impairments of depression and anxiety.  (Doc. 6-3, p. 21).  Based on a review of the medical evidence, the ALJ concluded that Ms. Helton did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Doc. 6-3, p. 22).[1]

Given Ms. Helton's impairments, the ALJ evaluated her residual functional capacity.  The ALJ determined that Ms. Helton had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except she was limited to occasional postural maneuvers; she was limited to occupations not requiring climbing of ropes, ladders, or scaffolds; and she need[ed] to avoid dangerous, moving unguarded machinery and unprotected heights.

(Doc. 6-3, p. 22).  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  "If someone can do light work, . . . she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files,

---

[1] The regulations governing the types of evidence that a claimant may present in support of her application for benefits or that the Commissioner may obtain concerning an application and the way in which the Commissioner must assess that evidence changed in March of 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction, 82 Fed. Reg. 15,132 (Mar. 27, 2017).  Because Ms. Helton filed her application for benefits before March 27, 2017, the new regulations, found at 20 C.F.R. §§ 416.913 and 416.920c, do not apply to her case. *See Morgan v. Comm'r of Soc. Sec.*, 760 Fed. Appx. 908, 911 n.2 (11th Cir. 2019).

ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

Based on this RFC, the ALJ concluded that Ms. Helton could perform her past relevant work as a cleaner/housekeeper and sales clerk.  (Doc. 6-3, p. 25).  Ms. Helton was 58 years old when she applied for disability benefits.  (Doc. 6-4, p. 4). A person who is over 55 is defined as a person of advanced age, which "significantly affects a person's ability to adjust to other work."   20 C.F.R. §§ 404.1563(e), 416.963(e).  Relying on a vocational expert's testimony, the ALJ found that jobs existed in the national economy that Ms. Helton could have performed, including cleaner/housekeeper (DOT 323.687-014), display merchandiser (DOT 290.081-010), and sales clerk (DOT 290.477-014).  (Doc. 6-3, p. 25).  Accordingly, the ALJ determined that Ms. Helton was not under a disability, as defined in the Social Security Act, at any time from December 14, 2015, the alleged onset date, through June 30, 2016, the date Ms. Helton last was insured.  (Doc. 6-3, p. 25).

## Analysis

Ms. Helton contends that she is entitled to relief from the ALJ's decision because the ALJ failed to properly evaluate the credibility of Ms. Helton's complaints of pain under the applicable pain standard.  (Doc. 11, p. 5).  The Court

begins its analysis with a review of the ALJ's application of the pain standard. Then the Court considers whether the ALJ properly evaluated Ms. Helton's complaints of pain and whether there is substantial evidence to support the denial of benefits.

***The Pain Standard***

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through . . . her own testimony of pain or other subjective symptoms." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 918 (11th Cir. 2019). When relying on subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*). If the ALJ does not apply the three-part standard properly, then reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921

F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that [s]he has a disability 'through [her] own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).  If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225; *Coley*, 771 Fed. Appx. at 918.  As a matter of law, the Commissioner must accept a claimant's testimony if the ALJ inadequately or improperly discredits the testimony.  *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When a claimant's credibility is at issue, Social Security Regulation 16-3p applies.  Regulation 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence.  In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and

other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.  An ALJ must explain the basis for findings relating to a claimant's description of symptoms:

> [I]t is not sufficient … to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough … simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.   In evaluating a claimant's reported symptoms, an ALJ must consider:

> (i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate … pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of … pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve … pain or other symptoms (e.g., lying falt on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

The ALJ should consider all three prongs of the pain standard to determine whether a claimant's pain is disabling, but an ALJ also must consider "'whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities.'" *See Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1308 (11th Cir. 2018) (quoting Social Security Ruling 16-3). The ALJ must evaluate whether the statements regarding limiting effects of pain are substantiated by objective medical evidence, and if they are not, the ALJ must consider other evidence in the record to determine how the symptoms limit the claimant's work-related activities. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Ms. Helton argues that the ALJ improperly applied the pain standard by "fail[ing] to properly consider [Ms. Helton's] longitudinal treatment history when determining [Ms. Helton] is capable of performing a reduced range of light work and [the ALJ's] determination is not supported by substantial evidence." (Doc. 11, p. 14). Ms. Helton also argues that the ALJ mischaracterized the record evidence. (Doc. 11, p. 7).

The ALJ considered Ms. Helton's "statements concerning the intensity, persistence and limiting effects of these symptoms" and found her testimony "not entirely consistent with the medical evidence and other evidence in the record . . . ." (Doc. 6-3, p. 23). Substantial evidence from Ms. Helton's medical records supports the ALJ's determination that Ms. Helton was not as limited by her pain as she asserts,

and the ALJ properly explained her reasons for rejecting statements by Ms. Helton and discussed which evidence contradicted Ms. Helton's pain testimony.

### *Ms. Helton's Medical Records*

Ms. Helton's medical records indicate that she was in a rear-end car accident on December 14, 2015, the alleged onset date. (Doc. 6-8, pp. 79, 84, 93, 119). On December 15, 2015, Ms. Helton sought treatment at Garrett Chiropractic. (Doc. 6-8, pp. 79–91). Dr. Garrett ordered x-rays of Ms. Helton's cervical, thoracic, and lumbo/pelvic spine, which revealed "evidence of a sprain/strain soft tissue injury," but "no apparent fractures, osseous pathology, or congenital abnormalities noted in the C-spine." (Doc. 6-8, p. 82). Dr. Garrett noted that Ms. Helton had "[l]oss of cervical lordosis." (Doc. 6-8, p. 82).[2] The records also show osteophyte formations at the C5-6 level and loss of disk height at the C4-5 and C5-6 spinal motion segments. (Doc. 6-8, p. 82).[3] Dr. Garrett diagnosed Ms. Helton with degenerative

---

[2] SCOLIOSIS REDUCTION CENTER, CERVICAL LORDOSIS AND WHAT CAUSES LOSS OF CERVICAL LORDOSIS, https://www.scoliosisreductioncenter.com/blog/loss-of-cervical-lordosis ("Healthy cervical lordosis refers to the natural c-shaped inward curve that characterizes the upper back and neck. When the spine in the neck region doesn't have the healthy curve that it should, this is a loss of cervical lordosis, and this also affects the thoracic spine that becomes straighter, introducing more abnormal spinal curvatures. When there is a loss of cervical lordosis, this means the cervical spine in the neck has lost its healthy c-shaped curvature and becomes straighter, or the curve can be reversed, known as a 'reverse curve'.") (last visited Dec. 11, 2020).

[3] OSTEOPHYTE (BONE SPUR), NHS, https://www.nhs.uk/conditions/osteophyte/ ("Osteophytes are bony lumps (bone spurs) that grow on the bones of the spine or around the joints. They often form next to joints affected by osteoarthritis, a condition that causes joints to become painful and stiff.") (last visited Mar. 9, 2021).

disk disease at C4-5, C5-6, L4-5, and L5-S1.  (Doc. 6-8, p. 83).  In the December 15, 2015 case history record, Dr. Garrett wrote that Ms. Helton stated:  "neck has severe [pain] that is constant.  Has a burning sensation down neck & travels down the spine.  Says she is dizzy this morning.  Has had a constant [headache] since & goes into lower.  Pain going down both arms to elbows/back.  Start seeing effects about 3 hours after the accident."  (Doc. 6-8, p. 84).

Between December 15, 2015 and January 29, 2016, Ms. Helton attended 17 treatment sessions at Garrett Chiropractic Clinic.  (*See* Doc. 6-8, pp. 87–91).  On February 6, 2016, Ms. Helton called and cancelled all future appointments and asked for a referral to a specialist.  (Doc. 6-8, p. 91).

On February 22, 2016, Ms. Helton met with Dr. Adderholt of Valley Neurosurgery.  (Doc. 6-8, p. 93).  Dr. Adderholt noted that Ms. Helton suffered from "neck and low back pain after an accident.  She had chiropractic treatment without much success.  She did have anti-inflammatories that did help but she is out of those.  She has no radicular symptoms.  No weakness, no numbness.  No other neurological complaints."  (Doc. 6-8, p. 93).  Ms. Helton reported bowel/bladder problems, dizziness, and headaches.  (Doc. 6-8, p. 93).  Dr. Adderholt diagnosed Ms. Helton's

---

EXPLAINING SPINAL DISORDERS: LUMBAR DEGENERATIVE DISK DISEASE, COLORADO COMPREHENSIVE SPINE INSTITUTE, https://www.coloradospineinstitute.com/conditions/lumbar-degenerative-disc-disease/ ("When disk height is lost, nerve impingement, bone and joint inflammation, and resultant pain can occur.") (last visited Dec. 11, 2020).

"current problems" as "1) M54.2 – Cervicalgia; 2) M54.5 – Low back pain; 3) M50.30 – Other cervical disc degeneration, unspecified cervical region; [and] 4) M51.36 – Other intervertebral disc degeneration, lumbar region." (Doc. 6-8, p. 94). Ms. Helton's neck was "supple and non tender. There are no carotid bruits." (Doc. 6-8, p. 94). Her gait and station were normal. (Doc. 6-8, p. 94).

An MRI taken "show[ed] minor disc bulging at C4-5 and 6. MRI of the lumbar spine shows again some minor degenerative changes at L4-5 and L5-S1. No nerve root or cord compression at any level." (Doc. 6-8, p. 94). Dr. Adderholt's impression was that Ms. Helton's neck and low back pain was caused by an aggregation of her degenerative disc disease. (Doc. 6-8, p. 94). He proposed a 30-day course of Cataflam.[4] He also "[r]ecommended continuing conservative measures with home exercise program and anti-inflammatories. Would not recommend any neurosurgical intervention." (Doc. 6-8, p. 94).

Between the alleged onset date and the date of last insured, Ms. Helton also regularly visited Dr. Evans, her primary care physician at Shoals Primary Care. During her January 11, 2016 appointment, Ms. Helton reported moderate pain

---

[4] CATAFLAM, WEBMD, https://www.webmd.com/drugs/2/drug-9836/cataflam-oral/details ("Diclofenac is used to relieve pain and swelling (inflammation) from various mild to moderate painful conditions. It is used to treat muscle aches, backaches, dental pain, menstrual cramps, and sports injuries. It also reduces pain, swelling, and joint stiffness caused by arthritis. Reducing these symptoms helps you do more of your normal daily activities. This medication is known as a nonsteroidal anti-inflammatory drug (NSAID).") (last visited Dec. 11, 2020).

"localized to the upper back and lower neck, bilaterally, and lower back, bilaterally. She relates that she had a recent motor vehicle accident which could have caused the conditions.  The symptoms are aggravated by weight bearing activity."  (Doc. 6-8, p. 119).  Dr. Evans prescribed Ms. Helton a 15-day supply of 325 mg-10 mg Norco.[5]

Ms. Helton returned for a follow-up visit with Dr. Evans on February 23, 2016, with a chief complaint of neck pain.  (Doc. 6-8, p. 113).  Dr. Evans wrote that Ms. Helton:

> return[ed] for evaluation of severe neck pain.  The pain is localized to the bilateral upper cervical spine, bilateral lower cervical spine.  The symptoms have been present for several months.  It has worsened over the last several weeks.  She relates that she had a prior history of a motor vehicle accident which could have caused the condition.  The symptoms are aggravated by a change in position.
>
> The pain is sharp, dull, and throbbing.  [Ms. Helton] states she was told by her neurologist to see her family physician.  [Ms. Helton] has been seeing a chiropractor since December 15, 2015 who has released her and referred her to Dr. Adderholt.  She saw Dr. Adderholt yesterday and he told her he did not want to perform surgery while she is still having pain from the whiplash.  She has been having headaches on both sides of her forehead.

(Doc. 6-8, p. 113).  While her gait and station were normal, an "examination of the spine, chest and pelvis revealed soft tissue tenderness joint tenderness of the cervical

---

[5] NORCO, DRUGS.COM, https://www.drugs.com/norco.html ("Norco contains a combination of acetaminophen and hydrocodone.  Hydrocodone is an opioid pain medication.  An opioid is sometimes called a narcotic.  Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone.  Norco is used to relieve moderate to moderately severe pain.") (last visited Dec. 11, 2020).

spine, (other) Muscle tenderness to both sides of cervical spine." (Doc. 6-8, p. 115). Ms. Helton rated her a pain a 5/10. (Doc. 6-8, p. 115). Dr. Evans referred Ms. Helton for physical therapy for her neck and prescribed a 30-day supply of Norco. (Doc. 6-8, pp. 116–17).

Ms. Helton returned to Dr. Evans on May 6, 2016 with a chief complaint of "neck pain, swelling in hands, feet and face." (Doc. 6-8, p. 108). Dr. Evans wrote that Ms. Helton's "pain is tingling in character. The symptoms are aggravated in the afternoon evening. The condition is associated with neck pain." (Doc. 6-8, p. 108). Ms. Helton again reported her pain level as 5. (Doc. 6-8, p. 110). The medical records suggest, although it is unclear, that Dr. Evans prescribed another 30-day supply of Norco to Ms. Helton. (Doc. 6-8, pp. 111–12).

Ms. Helton's final visit to Dr. Evans before her insurance expired was on June 29, 2016. Her chief complaints were anxiety and low back pain. (Doc. 6-8, p. 103). Dr. Evans recorded Ms. Helton's pain level at a 6. (Doc. 6-8, p. 104). Dr. Evans examined Ms. Helton's back and reported muscle tenderness and paraspinal muscle spasm on both sides of the cervical spine. (Doc. 6-8, p. 105). Dr. Helton prescribed Norco again. (Doc. 6-8, p. 106).

*Ms. Helton's Administrative Hearing Testimony*

In September 2016, Ms. Helton competed a function report.  (Doc. 6-7, pp. 39–54).  She explained that she did nothing from the time she woke up to the time she went to bed because the pain was too bad.  (Doc. 6-7, p. 39).  Ms. Helton reported that her husband helped her bathe, care for her hair, and use the toilet.  (Doc. 6-7, p. 40).  She did not prepare her own meals or do house or yard work.  (Doc. 6-7, pp. 41–42).

At the July 25, 2018 administrative hearing, Ms. Helton testified that throughout her recent work history, she had problems standing for long periods of time or otherwise carrying out assigned tasks.  Ms. Helton had worked as a merchandiser for Belk, a department store chain, "but it just got to where [she] couldn't even stand on [her] feet very long."  (Doc. 6-3, p. 81).  She explained that this was because of her back pain.  (Doc. 6-3, p. 82).  When the ALJ asked Ms. Helton why she had not been to vocational rehab to see if they could help her find a job, she explained:

> I have problems sitting long.  I have problems standing.  And if I've got to bend over and get on my knees or anything, I can't get up.  It hurts me so bad I cannot get up.  I went to work for Lassies Dress, I don't know if you see that, and I had to get down on the floor and pick up merchandise.  I couldn't even get up.  One of the employees had to pick me up off the floor because of my back.

(Doc. 6-3, pp. 84–85).   The ALJ asked Ms. Helton about Dr. Adderholt's recommendation declining surgical intervention.   The ALJ read Dr. Adderholt's recommendation into the record and asked Ms. Helton "[s]o you're saying [Dr. Adderholt] told you that he did not recommend [surgery] and gave you the choice?" Ms. Helton replied "[y]es, yes, Your Honor, he did.  I did go to Bone & Joint for I guess more like exercises or whatever they give you and it wasn't helping me." (Doc. 6-3, p. 85).

When her attorney questioned her, Ms. Helton testified that in 2016, she could only stand in one spot for about 30 minutes, she could only sit for between 45 minutes and one hour, and she could walk maybe 40 yards at a time.  (Doc. 6-3, pp. 86–87).  She also explained that "[a]nytime I bend over, my back does not want to straighten up."  (Doc. 6-3, p. 87).  Ms. Helton testified that between 9 a.m. and 5 p.m., she would spend approximately six hours laying down.  (Doc. 6-3, p. 88).

### The ALJ's Determination

The ALJ found that Ms. Helton's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."  (Doc. 6-3, p. 23).  The ALJ pointed to Dr. Garrett's notes from his December 15, 2015 evaluation of Ms. Helton, specifically noting that Dr. Garrett's x-rays found no fractures, osseous pathology, or congenital abnormalities.  (Doc. 6-3, p. 23).

17

The ALJ relied on Dr. Garrett's diagnosis of Ms. Helton's degenerative disc disease and stated that Dr. Adderholt's consultation supported that finding.  (Doc. 6-3, p. 23).  The ALJ noted that Ms. Helton did not report "the use of any analgesic, pain, or muscle relaxant medication.  On exam, she was in no acute distress, there was no edema, she had normal gait and station, monitor strength was normal at 5/5, reflexes were equal, and there were no pathological reflexes." (Doc. 6-3, p. 24).  The ALJ also explained that Dr. Adderholt's impression of Ms. Helton was that her neck and low back pain were caused by an aggravation of her degenerative disc disease, and he recommended conservative treatment of home exercise and anti-inflammatory medication.  (Doc. 6-3, p. 24).  The ALJ found it "noteworthy that the following day, on February 23 [2016], [Ms. Helton] saw her primary care doctor and instead of disclosing the only minor degenerative changes that are not candidate for surgery, she described that Dr. Aderholt [*sic*] told her he does not want to do surgery while she is still having pain from whiplash."  (Doc. 6-3, p. 24).

The ALJ found that Ms. Helton's medical records from her primary care physician, Dr. Evans, "during the period at issue are inconsistent with symptoms or limitations that would interfere with the above range of work.  The records show conservative care with oral medication for cervicalgia with referral to physical therapy without any alternative treatment, such as injections, being necessary." (Doc. 6-3, p. 24).  The ALJ found relevant that Ms. Helton did not seek care from

Dr. Evans during all of December 2015 "which is the month she reports having a 'severe' motor vehicle accident." (Doc. 6-3, p. 24).

The ALJ concluded that Ms. Helton "has mild/minor degenerative changes of the cervical and lumbar spine that are not associated with objective musculoskeletal or neurological deficits to interfere with the [light] range of work. She has been treated with oral medications for discomfort and spasms without requiring any injection therapy or management by a pain specialist." (Doc. 6-3, p. 24). And the ALJ noted that "[n]o physician treating or examining [Ms. Helton] has placed permanent functional limitations on her that interfere with the [light] range of work." (Doc. 6-3, p. 25).

***Substantial Evidence Supports the ALJ's Findings***

According to Ms. Helton, "[t]he record does not support the ALJ's determination that [she] has the residual functional capacity to perform a reduced range of light work." (Doc. 11, p. 7). This is because "[t]he ALJ erroneously relied upon isolated notations in the record to support her determination." (Doc. 11, pp. 7-8). Ms. Helton points out that the ALJ "found it significant" that she did not seek medical treatment the day of her accident and that the ALJ "seems to infer that [Ms. Helton's] allegations were inconsistent with her not seeking treatment on the day of the accident." (Doc. 11, p. 8). But the ALJ explained that Ms. Helton went to a chiropractor the day following the accident and began seeing her primary care

physician for treatment of her back pain a few weeks after the accident.  That is a fair and accurate description of the medical record.

Ms. Helton also argues that the ALJ failed to properly consider her longitudinal medical treatment "which is replete with [her] complaints of and treatment for her debilitating pain."  (Doc. 11, pp. 9-10).  Some of the medical records on which Ms. Helton relies to support her longitudinal treatment argument post-date the date she last was insured.  "[C]laimants must show that they were disabled on or before their last-insured date.  Consequently, to prove her eligibility for [disability insurance benefits, the claimant] had to prove that she suffered from a disability between her alleged onset [date] and her last-insured date [].  If a claimant becomes disabled after she has lost her insured status, her claim must be denied despite her disability."  *Mason v. Comm'r of Soc. Sec.*, 430 Fed. Appx. 830, 831 (11th Cir. 2011) (citations omitted and some brackets omitted).

In *Caces v. Comm'r of Soc. Sec.*, the Eleventh Circuit Court of Appeals found that the ALJ properly discredited the claimant's testimony regarding pain preceding the date on which he was last insured because, "[t]hroughout the insured period, the medical findings indicate that the pain was controlled with medication and injections without incident," and "the ALJ correctly gave 'little weight' to the medical evidence presented by Dr. Chappuis because he did not begin treating Caces until March 2008, long after his date last insured had passed."  560 Fed. Appx. 936, 940

(11th Cir. 2014).  The Court of Appeals held:  "Although the evidence showed a progressive worsening of Caces's condition over a time period extending past his date last insured, the record did not support Caces's assertions of pain so severe, persistent, and limiting such that he was rendered disabled before his date last insured. Accordingly, we affirm as to this issue."  560 Fed. Appx. at 940-41.

Here, Ms. Helton's post-insured-date evidence does not corroborate longitudinal treatment that shows Ms. Helton was disabled before the date she was last insured.  The evidence from later doctor's appointments points to neck pain that caused her confusion, memory loss, and migraines, (Doc. 6-9, p. 4); headaches with worsening tremor and unsteadiness with frequent falls, (Doc. 6-9, p. 9); and back pain, fatigue, and impaired concentration.  (Doc. 6-9, p. 141).  This evidence does not corroborate evidence showing that Ms. Helton was disabled on or before June 30, 2016.  Instead, it appears that Ms. Helton's condition deteriorated after the last date that she was insured.

The record here is much like the record in *Ingram v. Colvin*, 2014 WL 5090724 (N.D. Ala. Oct. 9, 2014).  There, in evaluating the ALJ's assessment of the credibility of the claimant's testimony concerning her disabling conditions, the district court explained:

> The plaintiff alleged that the ALJ failed to properly consider her longitudinal medical history. (Doc. 11 at 14.) However, Plaintiff only

21

cited one medical record, the initial letter from Dr. Barnes to her insurance company, that is dated before March 31, 2009, the date last insured, that corroborates her subjective complaint of pain caused by lymphedema. (Tr. at 227.) The remainder of the medical records Plaintiff cited were dated after the date last insured. For example, Plaintiff cites treatment notes from August 20, 2009, after the date last insured. These notes document Plaintiff's *complaints* of numbness, tingling, and weak limbs for the year prior to the treatment date; but she also indicated that her condition had become progressively worse.

2014 WL 5090724 at *5 (emphasis in *Ingram*) (citing *Demandre v. Califano*, 591 F.2d 1088 (5th Cir. 1979)).[6]

Therefore, substantial evidence supports the ALJ's decision because Ms. Helton's post-insured-date evidence did not corroborate a pre-insured-date finding of disability.

---

[6] The *Demandre* decision is binding authority for district courts in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (decisions that the Fifth Circuit Court of Appeals issued before October 1, 1981 are binding in the Eleventh Circuit Court of Appeals). In *Demandre*, the Court of Appeals found that "[t] he medical evidence generally supports a finding that Claimant's condition deteriorated after expiration of his insured status." 591 F.2d at 1090.

## Conclusion

The Court is sympathetic to Ms. Helton's condition, but the Court may not second-guess the ALJ's decision or reweigh the evidence where, as here, substantial evidence supports the ALJ's decision.  For the reasons discussed above, the Court affirms the Commissioner's decision.

**DONE** and **ORDERED** this March 9, 2021.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE